**D. K. CALDWELL, Appellant,**

v.

**Ellis CAMPBELL, Jr., former Collector of Internal Revenue, Appellee.**

**No. 14866.**

United States Court of Appeals,
Fifth Circuit.

Jan. 12, 1955.

R. B. Cannon, Fort Worth, Tex., Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel, for appellant.

C. Moxley Featherston, Sp. Asst. to Atty. Gen., Ellis N. Slack, Asst. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., John C. Ford, Asst. U. S. Atty., Dallas, Tex., Lee A. Jackson, Sp. Asst. to Atty. Gen., Heard L. Floore, U. S. Atty., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

HUTCHESON, Chief Judge.

The suit was for the refund of $322,087.45 overpaid for the fiscal year 1948

in connection with conveyances, for cash and notes, of mineral interests in the nature and form of oil payments, as to which the commissioner had determined: that they were not transfers on the installment plan, of capital assets, the gains therefrom capital gains, but anticipatory assignments of income, the gains therefrom ordinary income for the fiscal year 1948, measured by the cash and the discounted value of the notes; that the notes had a fair market value at the date of their receipt of $489,433; that plaintiff derived ordinary net taxable income from the conveyances in the amount of $357,311.18; and that, based thereon, plaintiff was due a deficiency assessment of $288,546.48 with interest.

The claim was: that the conveyances of mineral interests were in fact and law sales of capital assets held for more than six months; that any gain recognized therefrom was taxable under the provisions of Section 117, I.R.C., 26 U.S. C.A. § 117, that, since less than thirty percent of the selling price was received

in cash, plaintiff was entitled to the benefits of the installment sales provisions of Section 44, I.R.C., 26 U.S.C.A. § 44; and that, in the alternative, if the gain from the conveyances is taxable to plaintiff as ordinary income, he would realize such income only as and when the assigned oil payments were produced and made available to his assignee.

The answer, admitting all the facts alleged in the complaint, took issue only with its legal conclusions.

Tried to the court without a jury upon undisputed facts consisting of the admitted allegations in the pleadings, uncontested documents, and oral testimony, which was not at any point in contest or conflict, there was a brief and sketchy oral opinion,[1] and a judgment for defendant.

Seeking a reversal of that judgment and citing many cases in support,[2] plaintiff is here insisting: that it is completely without legal foundation, that, indeed, it is contrary to settled legal principles[3]

1. This in substance held: that refund claim complied with the law; that the D. K. Caldwell Foundation was "in truth and in fact" a charitable foundation; that the transfer of the royalties and the issuance of the notes in payment therefor was "not a bona fide transaction", that appellant did not expect to have "the notes paid by the charity, in truth, after their execution, and when he needed money, he called the notes before they were due and before the royalty had been produced, and used such notes as he thought was necesary for the payment, for instance, of the income tax which had been assessed against him"; that the notes were merely "substituted for what he already owned". Therefore, "the calculation of the reasonable market value of the notes at the time of their receipt was income that was taxable * * * that is the amount and the method that was used in fixing the amount of the tax;" and that judgment should be entered for the defendant.

2. Blair v. Commissioner, 300 U.S. 5, 57 S. Ct. 330, 81 L.Ed. 465; Campbell v. Prothro, 5 Cir., 209 F.2d 331; Commissioner of Internal Revenue v. Laird, 5 Cir., 91 F.2d 498; Fleming v. Campbell, 5 Cir., 205 F.2d 549; Lee v. Commis-

sioner, 5 Cir., 126 F.2d 825; Ortiz Oil Co. v. Commissioner, 5 Cir., 102 F.2d 508, certiorari denied 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475, affirming 37 B.T.A. 656; Perkins v. Thomas, 5 Cir., 86 F.2d 954, affirmed 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741; Sheppard v. Stanolind Oil & Gas Co., Tex.Civ.App., 125 S.W.2d 643; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A. L.R. 566; Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53; Thomas v. Peckham Oil Co., 5 Cir., 115 F.2d 685.

3. "(1) An oil payment interest, whether it be a 'reserved' or a 'carved-out' oil payment, partakes of the nature of a terminable royalty interest in minerals;
"(2) It is an interest in realty;
"(3) The holder of such interest, and he or it alone, is entitled to the allowance for statutory percentage depletion with respect to the proceeds of production attributable to the oil payment interest; and
"(4) The sale, transfer or exchange of either a retained or a carved-out oil payment for more than its cost does not produce depletable income from the property, but a gain from the sale of realty, the

declared in the Texas cases and in the decisions of this court, and must be reversed with directions to enter judgment for him.

Appellant points to the fact that the commissioner concedes that if the court meant to find that the transaction was not a bona fide one, the judgment would be invalid, for in such event the taxpayer would continue to be the owner of the mineral interests and would realize taxable income and be taxable in accordance with his alternative contention upon the royalty income as it was produced from year to year. So pointing, he urges with confidence and conviction, as his first ground of attack, that the district judge erred in holding that the transaction was not bona fide and, in the same breath, that from receipt of the cash and notes he received ordinary income. Advancing, then, to the next step of his argument, he thus convincingly and, we think, correctly, presents it and the conclusions to be drawn therefrom:

"A. That these transfers constituted sales of real property used in taxpayer's business and/or capital assets held for more than six months, and, under the provisions of Section 117, Internal Revenue Code, any gain therefrom is taxable as long-term capital gain, rather than as ordinary income; and

"B. Since less than thirty percent (30%) of the selling price was received within the year in cash or property other than evidences of indebtedness of the purchaser, any realized and recognized gain resulting therefrom was reportable on an installment basis, viz., ratably when and as the collection of the agreed sale price is made. Sec. 44, Internal Revenue Code."

The collector cites no case directly in point, indeed he admits that there are none holding, as he contends, under the precise facts of this case that the transfer outright, as here, of mineral interests in the form of in-oil payments is an anticipatory assignment of income. His argument, that because the royalties out of which the in-oil payments were earned would, when received, be income to the grantor, they cannot be regarded and sold as capital assets, and transfers of them must under the teachings of the Earl case[4] be treated as anticipatory assignments of income will not, we think, at all do. Such arguments run counter to both the fact and law of the matter, to the fact in that the carving out and the sale or retention of in-oil payments property to be bought and sold constitute a large part of the dealings in oil in Texas, to the law in that the decisions of State and Federal courts are to the contrary, and that the treatment normally accorded them taxwise is likewise to the contrary.

As we understand appellee's brief, he concedes that this is so where a royalty or part of it is sold, or even where the sale is of an in-oil payment, if this is all that the seller owns. The effort here, as stated in G.C.M. 24849,[5]

---

tax consequences of which are fixed by those statutory provisions dealing with gains from sales or exchanges of property."

4. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731.

5. As stated in the headnote, this is the essence of the ruling:

"Consideration received for the assignment of a shortlived in-oil payment right carved out of any type of depletable interest in oil and gas in place is ordinary income subject to the depletion allowance

where such consideration is not pledged for use in further developments."

The ruling, then, after recognizing "that the holder of an in-oil payment right, however acquired, has a repletable economic interest in oil and gas in place, continues:

" * * * In-oil payment rights are distinguishable from royalty interests and operating rights in that the latter interests, by definition, extend to the entire oil and gas resource content of the land, and, as such, represent forms of fraction-

1946–1, CB p. 66, and I.T. 4003,[6] CB 1950–1 page 10, opinions having no more binding or legal force than the opinions of any other lawyer, (Cf. United States v. Bennett, 5 Cir., 186 F.2d 407 at page 410 is to draw a distinction, property and taxwise, between royalties and carved out "in-oil payments", a distinction which the decisions, state and federal, do not recognize or countenance. If recognized, it would pervert the correct principle announced in the Earl case, to run it into the ground, as the collector unsuccessfully attempted to do in Campbell v. Prothro, 5 Cir., 209 F.2d 331.

The emphasis of the collector in his brief on the loss to the treasury which will result, if the taxpayer is permitted to sell in-oil payments such as these and thereby reduce his taxes, and his conclusion, "Obviously here is a case of a taxpayer trying to use, the exempt status of a charitable foundation which he controlled, the capital gains and the installment sale provisions of the revenue laws for his personal profit", is profoundly revealing. For it shows at once the complete fallacy on which the whole argument is based, and the real unsoundness of the collector's position since it requires resort to an argument of this kind.

If given effect, as broadly advanced by him, the argument would defeat every transfer or assignment of a mineral interest of every kind or nature, whether donative or upon consideration, the effect of which would reduce the taxes of the transferor, a *reductio ad absurdum* which truly tests the fatal weakness of the argument.

Not a single case cited by appellee supports its view. Rudco Oil & Gas Co. v. United States, 82 F.Supp. 746, 113 Ct. Cl. 206, on which he seems to rely most strongly, is wholly different on its facts. It was, a case of the declaration of a dividend as was our case of Commissioner of Internal Revenue v. First State Bank of Stratford, 5 Cir., 168 F.2d 1004, 7 A.L.R.2d 738, a case of a corporation dealing deviously through its stockholders, as in Floyd v. Scofield, 5 Cir., 193 F.2d 594.

All of these cases dealt with action devised to avoid the payment of taxes by the corporation but legally inadequate to effect the desired result. More important still, the transaction in the Rudco case was not, as the one was here, a real transfer of an oil interest for a long period of years. It was in effect a mere appointment of the stockholders to receive the mineral income of the corporation for sixty or ninety days of the taxable year in which the purported transfer was made. It was, therefore, a completely abortive attempt, like those dealt with in the Horst, the Harrison, and the Eubank

---

al property rights into which the property interests in oil and gas in place are commonly divided, whereas, an in-oil payment right is a right to income for a limited time or amount. * * *"

6. "* * * there is no legal or practical basis for distinguishing between short-lived and long-lived in-oil payment rights. It is, therefore, the present position of the Bureau that the assignment of any in-oil payment right (not pledged for development), which extends over a period less than the life of the depletable property interest from which it is carved, is essentially the assignment of expected income from such property interest. Therefore, *the assignment for a consideration of any such in-oil payment right re-*sults in the receipt of ordinary income by the assignor which is taxable to him when received or accrued, depending upon the method of accounting employed by him. *Where the assignment of the in-oil payment right is donative, the transaction is considered as an assignment of future income which is taxable to the donor at such times as the income from the assigned payment right arises.*

"Notwithstanding the foregoing, G.C.M. 24849, and I.T. 3935, supra, do not apply where the assigned in-oil *payment right constitutes the entire depletable interest of the assignor in the property or a fraction extending over the entire life of the property*". (Emphasis supplied.)

cases,[7] to change the statutory rule for the taxation of income by appointing one to collect as his own the income of another.

In view of the collector's insistence that these three cases and the Earl case determine the issue in his favor, a brief review of their holdings is in order. The Earl case dealt with *money income* from earnings which the husband might make, and in it the court declared that the "revenue act * * * imposes a tax upon the net income of every individual including 'income derived from salaries, wages, or compensation for personal services * * * of whatever kind and in whatever form paid,' ". It then went on to say in effect that the import and reasonable construction of the taxing act was that the tax could not be escaped by him upon whom it was imposed "by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it."

The opinion then concluded with the figure, "the arrangement by which the fruits are attributed to a different tree from that on which they grew".[8]

In Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 332, 81 L.Ed. 465, the court, holding, that the validity of assignments of interests in the net income which the petitioner as a beneficiary in a trust was then, or might thereafter be, entitled to receive during his life, was a question of local law, and that they were valid under Illinois law, held for the reasons there fully stated that the assignments were not invalid taxwise under Lucas v. Earl, supra. Of the Earl case, the court said:

" * * * We were of the opinion that the case turned upon the construction of the taxing act. We said that 'the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it.' That was deemed to be the meaning of the statute as to compensation for personal service and the one who earned the income was held to be subject to the tax. * * *

"In the instant case, the tax is upon income as to which, in the general application of the revenue acts, the tax liability attaches to ownership. See Poe v. Seaborn, supra [282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239]; Hoeper v. Tax Commission, 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248."

The next cases to follow were the three in volumes 311 and 312 U.S. [61 S.Ct. 148] note 7, supra, on which the collector's contention is mainly based.

The first, the Horst case, dealt with a simple and direct application of the Lucas Earl doctrine by applying it to negotiable interest coupons which in 1934 and 1935 the taxpayer detached from negotiable bonds and gave to his son who in the same year collected them at maturity. The court held that these coupons, like salaries, *were, when received,* income to their owner, though

---

7. Helvering v. Horst, 311 U.S. 112, 61 S. Ct. 144, 85 L.Ed. 75; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L. Ed. 81; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055.

8. In Saenger v. Commissioner, 5 Cir., 69 F.2d 631, at page 632, we said:
   "The rule of the Earl Case, while made graphic by a figure, is more than a figure of speech. It is an expression of the simple truth that earned incomes are taxed to and must be paid by those who earn them, and unearned incomes to those who own the property or right that produced them, not to those to whom their earners or owners are under contract to pay them. * * *
   "The rule does not make taxable to one the income of another. It operates to prevent this occurring. If what is done in any case, no matter what form of words is used, amounts to the transfer of the right or title to that from which the income springs, the income follows the right. * * * "

received by another to whom he had given the right to receive them. In discussing its reasons for so holding, the court, in no manner departing or detracting from Blair v. Commissioner, dealt with them in a manner to make clear the distinction which applies here between the assignment of an interest in property from which the income proceeds and of a mere right to receive income, saying:

"This was emphasized in Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, on which respondent relies, where the distinction was taken between a gift of income derived from an obligation to pay compensation and a gift of income-producing property. *In the circumstances of that case the right to income from the trust property was thought to be so identified with the equitable ownership of the property from which alone the beneficiary derived his right to receive the income and his power to command disposition of it, that a gift of the income by the beneficiary became effective only as gift of his ownership of the property producing it. Since the gift was deemed to be a gift of the property the income from it was held to be the income* of the owner of the property, who was the donee, not the donor —a refinement which was unnecessary if respondent's contention here is right, but one clearly inapplicable to gifts of interest or wages. *Unlike income thus derived from an obligation to pay interest or compensation, the income of the trust was regarded as no more the income of the donor than would be the rent from a lease or a crop raised on a farm after the leasehold or the farm had been given away.* Blair v. Commissioner, supra, 300 U.S. 12, 13, 57 S.Ct. 333, 81 L.Ed. 465, and cases cited. * * *" (Emphasis supplied.)

Helvering v. Eubank, note 7, supra, a case of renewal commissions, which had been paid by insurance companies to the assignee of an agent, was disposed of in a brief opinion as a companion case to Helvering v. Horst, note 7, supra, and as presenting issues not distinguishable from those in that case. The court, in the Eubank case [311 U.S. 122, 61 S.Ct. 150] put the gist of the decision thus:

"*No purpose of the assignments appears other than to confer on the assignees the power to collect the commissions, which they did in the taxable year.* The Government and respondent have briefed and argued the case here on the assumption that the assignments were voluntary transfers to the assignees of the right to collect the commissions as and when they became payable, and the record affords no basis for any other.

"For the reasons stated at length in the opinion in the Horst case, *we hold that the commissions were taxable as income of the assignor in the year when paid.*" (Emphasis supplied.)

Finally, in Harrison v. Schaffner, note 7, supra, it was held that an assignment, by the life beneficiary of a testamentary trust, of the income of the trust for the year following the assignment was taxable to the assignor in the year when received by the assignee. Not at all departing from, criticizing, or limiting its decision in the Blair case, but reaffirming it, the court held, following Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, that the gift "by a beneficiary of a trust of some part of the income derived from the trust property for the period of a day, a month or a year involves no such substantial disposition of the trust property as to camouflage the the reality that he is enjoying the benefit of the income from the trust of which he continues to be the beneficiary, quite as much as he enjoys the benefits of interest or wages which he gives away as in the Horst and Eubanks cases. * * * *It is enough that we*

*find in the present case that the taxpayer, in point of substance, has parted with no substantial interest in property other than the specified payments of income which, like other gifts of income, are taxable to the donor."* [312 U.S. 579, 61 S.Ct. 761.] (Emphasis supplied.)

In every one of these cases what and all that was involved was the appointment of someone to collect money which, if collected by the appointer, would have been income to him. In none of them was it held that an assignment of the tree which produced the income, as here the mineral interests, would, when accounted for to the owner by the oil company which produced them in money rather than in kind, be treated as the income of the transferor merely because if he had remained the owner, they would have been his income.

█ It seems clear to us, then, that the whole idea back of the commissioner's and the collector's actions and contentions is an attempted denial of the fundamental principle of taxation. This is that a taxpayer is entitled to take any legal course with his property or business which lightens or lessens his tax load, and that the fact that an arrangement reduces his taxes is of no moment in determining its validity,[9] if only it is clear that the transaction was real and not a sham, that is if it was what it purported to be, a real and effective transfer of title from the taxpayer to another.

The judgment was without factual and legal basis. It is reversed and the cause is remanded with directions to enter judgment for the plaintiff.

RIVES, Circuit Judge, dissents.

RIVES, Circuit Judge (dissenting).

With the legal principles set forth in the majority opinion with such admirable clarity and vigor, I am in hearty accord. The question as to which of those principles is applicable to the transactions here involved gives me more concern. A solution of that question depends upon the nature of those transactions. Were they simple sales of interests in realty as the majority holds, and as they appeared in form, or were they, in substance and reality, assignments of income?

To pierce the form and uncover the realities of the transactions, it is necessary to review more of the precise factual situation disclosed by the undisputed evidence. The oil royalty interests which the taxpayer owned were located in the East Texas, Van Hawkins, and other Texas oil fields, long-life fields in which production was reasonably certain for a period of at least twenty-five years from 1948. The D. K. Caldwell Foundation was the creature of the taxpayer and controlled by him. Just before these transactions, its total assets amounted to only $14,176.78. Except for the differing amounts of the agreed sums of money, each of the conveyances of oil payment rights to the Foundation contained an identical limitation as follows:

"This conveyance shall be effective as of 7 A.M. August 1, 1948 and shall remain in effect until such times as the Trustees of the D. K. Caldwell Foundation, their successors and assigns, have received from the proceeds of oil or gas produced, saved and marketed from the above mentioned mineral interests, the total aggregate sum of Three Hundred Fifty Thousand and No/100 ($350,000.00) Dollars. And after the said D. K. Caldwell Foundation has received said total sum of Three Hundred Fifty Thousand and No/100 ($350,000.00) Dollars, then the royalty interests hereinabove conveyed shall revert to and revest in said D. K. Caldwell, his heirs and assigns."

---

9. Cf. West v. Commissioner, 5 Cir., 214 F.2d 300 at page 303, and the Friedland-er Corp. v. Commissioner, 5 Cir., 216 F.2d 757.

The proceeds of the oil sales to be received by the Foundation, the cash consideration and the face amount of notes payable to the taxpayer, provided for in the several conveyances, were as follows:

| Location of Property | Oil Proceeds to be Received by the Foundation | Cash to be Received by Taxpayer | Face Amount of [1] Notes Payable to the Taxpayer |
|---|---|---|---|
| E. Texas No. 1 | $350,000 | $ 500 | $233,000 |
| E. Texas No. 2 | 356,100 | 400 | 237,000 |
| Hawkins | 136,000 | 1,000 | 135,000 |
| Van | 572,000 | 1,000 | 380,000 |
| Coke | 31,000 | 500 | 20,000 |

The approximate pay out periods were as follows:

| Location of Property | Months Required for Pay Out of Consideration | Months Required for Pay Out of Face Amount of Oil Proceeds Transferred |
|---|---|---|
| E. Texas No. 1 | 88 | 131 |
| E. Texas No. 2 | 78 | 117 |
| Hawkins | 127 | 127 |
| Van | 78 | 123 |
| Coke | 103 | 154 |

Other than the statutory warranty implied from the use of the words "grant" and "convey", Art. 1297 Vernon's Revised Civil Statutes, the conveyances contained no warranty of title. The taxpayer retained a vendor's lien on the oil payment rights to secure the payment of the notes. The taxpayer testified that the Foundation, at the time these oil payments were transferred to it, had no facilities for receiving and storing the oil for resale, and that it was expected that the oil would be sold as produced. The proceeds of such sales constituted the only sources from which the Foundation could pay the notes. Its other assets were, comparatively speaking, of nominal value. The Foundation acquired no dominion over the oil before it was produced. Its rights were limited to the profits from the land to the extent of a specified number of dollars as the oil was produced over a period varying from 117 months to 154 months. In return for his right to receive this income, the taxpayer got notes which concededly had an immediate fair market value of $489,433.00.

It seems to me that, if by this process the taxpayer could convert his ordinary income from these properties into capital gain, then hereafter there will be no necessity for an owner of oil royalty interests to receive therefrom ordinary income. He need only "convey" the oil payment rights for one year, ten years, thirteen years, or such other period of time as may be most profitable, and report his receipts as capital gains. Of course, an owner of oil royalty interests stands upon the same footing as any other taxpayer, that is with the exception of the depletion allowance to which he is entitled by law. The situation is analogous to that of an ordinary lessor under a long term, say thirty year, lease, who sells some of his annual rent notes, say ten or thirteen of them. Would that be a transfer of the fruits or of the tree on which they grew? See Lum v. Com-

---

1. Eleven per cent of the notes were determined by the Commissioner of Internal Revenue to have belonged to others.

missioner, 3d Cir., 147 F.2d 356; 2 Mertens Law of Federal Income Taxation, Sec. 18.12.

Unless the property itself is transferred, or some more substantial economic interest in the corpus than appears from the facts of this case, it seems to me that the taxpayer is merely collecting some of his royalty income in advance. See Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055. The assignment in that case was of specified amounts in dollars from the income of a trust for the year following the assignment. Does it make any difference that the time involved was one year instead of from nine to thirteen years, as in the present case? I think not, so long as the transfer passes nothing substantially more than the right to collect future income, and when so many of the attributes of ownership remain in the transferor as to justify the conclusion that he continued to be the owner of the oil royalty interests within the meaning of Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a).

I therefore respectfully dissent.