**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**P. G. LAKE, Inc., Respondent.**

**No. 16126.**

United States Court of Appeals
Fifth Circuit.

Feb. 1, 1957.

Melva M. Graney, Hilbert P. Zarky, John N. Stull, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., John Potts Barnes, Chief Counsel, Claude R. Marshall, Sp. Atty., I. R. S., Washington, D. C., for petitioner.

Harry C. Weeks, Fort Worth, Tex., for respondent. Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HUTCHESON, Chief Judge.

This appeal by the commissioner from one of a series of adverse decisions [1] of the Tax Court presents the single question whether $600,000 received as consideration for an assignment of overriding oil payment interests limited to $600,000 carved out of two oil and gas

---

1. Lake v. Commissioner, 24 T.C. 1016; Fleming v. Commissioner, 24 T.C. 818; Wrather v. Commissioner (not officially reported); Weed v. Commissioner, 24 T.C. 1025; and Slagter v. Commissioner, 24 T.C. 935; 7 Cir., 238 F.2d 901.

leaseholds or working interests [2] is taxable to the seller as ordinary income subject to depletion rather than, as the Tax Court held, as long term capital gains under Sec. 117 of the 1939 Internal Revenue Code, 26 U.S.C.A. § 117.

Here vigorously assailing the decision of the Tax Court in this and the other cases, on the ground that they were all based on the premise that all oil payment assignments constitute sales of capital assets entitled to capital gains treatment under Sec. 117, and declaring, "That premise was specifically rejected in the Hawn case", the commissioner thus continues:

"In the present case, as in some of the other appealed cases, the assignor was a leasehold owner which created the oil payment right not just, like the taxpayer in Hawn, the owner of a larger oil payment right. For that reason, the case calls for an even more basic application of the anticipatory assignment of income rule than did Hawn. Not only that, any attempt to treat the oil payment assignment as a sale of property according to ordinary property law

concepts merely confirms the conclusion that it was an anticipatory assignment of income.

"Our position here in no way conflicts with this court's decision in Caldwell v. Campbell, 218 F.[2d] 567 where * * * the assigned oil payment rights were carved out of royalty interests * * * ".

Having thus, as he thinks, cleared the ground for an all out and unembarrassed attack on the Tax Court's ruling, the commissioner assails it: (1) as contrary to our decision in Hawn's case in that it treats as substantial an interest which, under the teachings of that decision, is insubstantial; (2) in that what was here transferred was not any part of the leasehold interest, the "property representing income producing property, the vendor's capital investment", it was a transfer merely of a right to receive future income and, under the teachings of Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, and the Corn Products case, Corn Products Refining Co. v. Commissioner, 350 U.S. 46–52, 76 S.Ct. 20, 24, 100 L.Ed. 29,[3] it was not entitled to Sec. 117 preferential treat-

2. The respondent is a Delaware corporation with its principal office in Tyler, Texas, engaged in the business of producing oil and gas, and on Dec. 29, 1950, it owned the 7/8 working interest in two commercial oil and gas leases from which it, as the operator, was then, and for several years had been, producing oil in substantial quantities.

On Dec. 29 1950, respondent was indebted to P. G. Lake in the amount of $600,000, and on that date, in consideration of the cancellation of that indebtedness, it sold and transferred to Lake "such an interest in said oil and gas leases * * * so that the said P. G. Lake, Grantee, shall own twenty-five percent of seven-eighths of all oil and gas in, under, or upon such leases and each of them, and shall be entitled to receive 25 percent of 7/8 of all the oil, gas and other minerals produced, saved, and marketed from the above described oil and gas leases and leasehold estates, from and after 7:00 a. m., January 1, 1951, until said Grantee, his heirs and assigns, shall have received by virtue of this interest the sum of $600,000 net to him * * * ".

The assignment also assured that he should have a royalty owner's status, that is that his 25 percent of the 7/8 of the working interest should be free and clear of any development or production expenses.

It finally provided that after grantee had received the full net sum of $300,000, with interest as provided, from the proceeds of the sale of said 25 percent of 7/8, the conveyance shall terminate and the interest assigned "shall revert to and revest in the grantor, its successors and assigns, and grantee shall execute and deliver an instrument of reconveyance of said interest, and any such other papers as may be necessary to replace the title in grantor".

On Dec. 29, 1950, it could have been estimated with reasonable accuracy that it would require three years or more for the leases to produce oil and gas of the value in amount to which grantee was entitled in the assignment. The actual pay out period was from Jan., 1951, to February, 1954, a little over three years.

3. "Congress intended that profits and losses arising from the everyday opera-

ment; (3) in that, if contrary to No. (2) above, the oil payment is treated as a sale of income producing property, it had not been held for six months because it did not come into existence until the oil payment was created; and (4) in that the property sold was the oil itself and thus was property "primarily held for sale in the ordinary course of business", and specifically excluded from capital gains treatment.

In reply to these contentions, respondent, insisting that all prerequisites to long term capital gains treatment, if there was a sale of "property" or "real property used in the trade or business" within Sec. 117 I.R.C. of 1939, are here present, urges upon us that whether or not there was such a sale here is ruled by Ortiz Oil Co. v. Commissioner, 5 Cir., 102 F.2d 508 and Caldwell v. Campbell, 5 Cir., 218 F.2d 567, and not by Commissioner of Internal Revenue v. Hawn, 5 Cir., 231 F.2d 340.

Arguing that the first two cases treat similar transactions to these as sales, that the Hawn case is clearly distinguishable and that petitioner's arguments have heretofore been rejected by this court in Caldwell v. Campbell, respondent points out that a glance at the table of cases in commissioner's brief and in the brief of Collector Campbell in Caldwell v. Campbell will show that commissioner's opposing arguments here are but an expanded repetition of those advanced in that case.

Insisting that the transaction under consideration was an assignment of a part of respondent's property interests in the two leases, the respondent cites in

support Commissioner of Internal Revenue v. Fleming, 5 Cir., 82 F.2d 324; Columbus Oil & Gas Co. v. Commissioner, 5 Cir., 118 F.2d 459; Thomas v. Peckham Oil Co., 5 Cir., 115 F.2d 685; Lee v. Commissioner, 5 Cir., 126 F.2d 825; and Fleming v. Campbell, 5 Cir., 205 F.2d 549.

They recall too that the Supreme Court of the United States, this court, the Supreme Court, and the Intermediate Appeal Courts, of Texas [4] have held that oil and gas leases, royalty interests, overriding royalty interests, and oil payments are interests in land, and that the Texas courts have held that these interests, are subject to ad valorem taxes, to statute of frauds treatment as real estate and in cases of intestacy pass as real estate.

On the commissioner's general position that oil payments carved out of working interests differ from royalties so carved, respondent, quoting from Tennant v. Dunn, supra, 130 Tex. at page 290, 110 S.W.2d at page 56:

"The interest assigned or conveyed by the instrument is in the nature of an overriding royalty. The assignment gives to Mrs. Dunn, as the reservation of an ordinary overriding royalty gives to or retains in the grantor or assignor, the right to a certain quantity of oil taken from the land, delivered as it is produced, free of charges or expenses of production or operation. * * * It is our opinion that the instrument under consideration conveys an interest in the land * * * "

---

tion of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106, 53 S.Ct. at page 75."

4. Waggoner Estate v. Wichita County, 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566; Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; cases cited in footnote 2 of Caldwell v. Campbell, 5 Cir., 218 F.2d 567, at page 568; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53.

points to the uniform course of decision that oil payments are in law and in fact of the same nature, indeed are identical, with royalties, except that a royalty is not limited as to duration and an oil payment is.

To commissioner's third contention that respondent did not have the requisite six months holding period for the oil payment interest conveyed, *a contention on its face requiring the wholly untenable postulate that respondent, in and by the act of conveying the oil payment, acquired it,* respondent points to its complete refutation in the stipulation that *respondent had owned and held the leases for productive use in its trade or business of producing oil and not for sale for several years prior to* Dec. 29, 1950, and to the fact that it is obvious that what respondent conveyed, and the only thing that it could convey, was a part of the estate which it acquired in the acquisition of the leases.

As to his fourth contention, that, **in** assigning an interest in the leases, *respondent did not assign any part of the property held by it for producing income but assigned merely the oil, the property held for sale in its daily business,* and that this must be so *because the interest of any oil payment owner is only in the oil as personal property,* respondent quotes from the leading case of Tennant v. Dunn, supra, in which, after stating that the particular instrument in question in that case, which carved an oil payment out of a working or leasehold interest, *did not purport to convey oil in place,* and that the ultimate right of Mrs. Dunn was a right to a certain quantity of oil after it was produced from the well, the same to be delivered to her free from any charges for production or operation, went on to say:

> "*It does not follow, however, that the instrument does not create an interest in land or that it evidences merely a debt to be paid out of oil produced. The oil and gas lease operated to invest the lessee with a determinable fee in the oil and gas in place. * * * The instrument*

above set out under which Mrs. Dunn claims follows *the form ordinarily used by a lessee in assigning or conveying an interest in the leasehold estate.* It is not a promise to pay money. *It is not a contract for the sale and delivery of oil as personalty after production, but it undertakes to invest the assignee, and we think it does invest her, presently with a right or interest in what the assignor owned.* * * * *A part of the lessee's right or interest is assigned,* not a fractional interest in the entire leasehold estate but the absolute right, without charges for production or operation, to a fractional part of the oil as and when it is produced from a well on the leased land until the assignee has received oil of the total value of $25,000. *The total quantity of oil to be delivered to the assignee is not a fixed fraction of the entire production, and is not a certain number of barrels, but it is measured by value according to a specified standard.* [130 Tex. at page 290, 110 S.W.2d at page 56.] * * * *The gist of the opinion in Sheffield v. Hogg is that oil and gas royalties, whether payable in kind or in money,* * * * *should be adjudged to be present interests in land rather than mere rights in personalty at some uncertain date, because they are profits arising out of land, and, further, because such classification, which accords with the practice in the oil and gas industry, furnishes a stability highly important, if not essential, to the structure of that business.* * * [130 Tex. at page 292, 110 S.W.2d at page 57.]

"The fact that Mrs. Dunn's purchase of the interest was highly speculative, and that she might realize either nothing or very large profits, does not affect the nature of the interest. Most investments in oil properties or production are speculative. Mrs. Dunn did not become by virtue of the assignment a min-

ing partner or a joint adventurer, *for it gave her, not merely a part of the profits of the enterprise, but an interest in land, free of charges for development or operation and without obligation to share in losses;* and under the assignment she had no right to engage, and did not in fact engage, in the operation of the leased land or of the well. * * * " 130 Tex. at page 294, 110 S.W.2d at page 59. (All emphasis supplied.)

Finally, it is respondent's position that in the light of the views above expressed, this court is bound by the settled law of the cases, including particularly Ortiz Oil Co. v. Commissioner, 5 Cir., 102 F.2d 508; Fleming v. Campbell, 5 Cir., 205 F.2d 549; Caldwell v. Campbell, 5 Cir., 218 F.2d 567, 568; and Commissioner of Internal Revenue v. Hawn, 5 Cir., 231 F.2d 340; and the cases they cite and rely on, to hold that the tax court was right and its judgment must be affirmed.

For the reasons hereafter stated, we find ourselves in complete agreement with these views.

Taking up the grounds put forward by the commissioner for reversal and rejecting, on the stipulated facts, note 2, supra, and for the reasons fully stated in Scofield v. O'Connor, 5 Cir., 241 F.2d 65 just decided, the first ground that this court's decision in Hawn's case requires a contrary holding to that made below, we take up to consider in their turn the second, third, and fourth grounds.

These grounds, as we think we shall show, while put forward by the commissioner as presenting new and sound reasons for persisting in his contention that a sale of oil payments is not a sale of capital assets entitled to capital gains treatment, merely give a superficially new look to and faultfully reargue the old contention. This is accomplished by basing the new argument upon a series of unfounded assumptions as to, and the failure to recognize, the already settled state of the law on the matters discussed.

It is, of course, not conclusive against the commissioner's arguments put forward here for the first time in support of his unyieldingly held and persistently urged general contention, that sales of oil payments are not entitled to capital gains treatment, that they have been put forward in this form in no prior litigations or in the Tax Court in the cases under review here.

It is, however, significant that the propound discovery announced and urged for the first time on this appeal, that the sale of an oil payment carved out of a working interest in its legal aspects differs from the sale of an oil payment carved out of an oil interest, has heretofore escaped the attention of judges, lawyers, text writers, and commentators. As far as our information or observation goes, none of the many litigations arising out of or connected with oil payments, none of the decisions, state or federal, dealing with oil payments carved out of a leasehold estate and holding that they are in the nature of overriding royalties, none of the many textbooks, law reviews, or briefs which have dealt with oil payments, have drawn the distinction the commissioner now seeks to draw between oil payments carved out of leasehold interests and those carved out of royalty interests.

This significance is heightened by the fact that the commissioner, as we understand, concedes that overriding royalty interests carved out of working interests or to which working interests are subject are in nowise different from royalty interests reserved to or granted by the owner of the fee.

In short, a careful consideration of the long and involved arguments put forward in the briefs in these cases in support of the commissioner's new look and view make it plain we think that, *viewed not as proposals for legislation,* in which case wholly different considerations would apply, but as restatements of the law of the decided cases, they rest on demonstrably false premises whose discovery and exposure they cannot survive.

The first of these premises is that the assignment of an oil payment carved out of a leasehold estate is not an assignment of a part of the interest conferred by the lease, a premise precisely refuted in Dunn's case.[5] This premise repeated and affirmed over and over stems from the failure of the commissioner to understand, or his unwillingness to recognize, the nature of such an oil payment, a refusal or failure having nothing to do with the substance and reality of the transaction under review, or with the decisions in point.[6] It arises, in short, entirely out of his giving the word "payment" its dictionary meaning where used alone as the satisfaction of a debt or obligation, instead of in the phrase "oil payment" the clearly understood meaning as a part of a technical descriptive phrase used in conveying carved out interests in oil, a meaning which the decisions have ascribed to and fixed for it when used in the connection under consideration here.

An examination of the many cases, federal and state, which have dealt with oil payments, shows that, without varying, the courts have treated alike oil payments whether carved out of the working or the royalty interests, and that the so-called distinction between them, which the commissioner urges here, has never been made before.

■ It is, we think, completely fallacious to say that an oil payment carved out of a leasehold interest stands any differently in law from an oil payment carved out of a royalty interest, and it is only by the repetition of the incorrect statement, that they do stand differently, that the argument is, or can be, called an argument.

The commissioner's new approach, therefore, that in this case, because the oil payment was carved out of a working interest, there was not a sale of income producing property, a part of the leasehold interest, but merely of oil as personal property after it is produced, is seen to be in complete contradiction of the law of the cases.

Equally fallacious is the commissioner's fourth point, that, assuming that he is incorrect in contending that the sale of the carved out oil payments was not the sale of a capital asset, held for production of income but was an anticipatory sale of the income itself, what respondents sold, though a capital asset, is merely the oil itself, "property held primarily for sale", and therefore, the sale comes within the express exception from Section 117.

In the first place, the Supreme Court of Texas, in Tennant v. Dunn, supra, saying *"It is not a contract for the sale and delivery of oil as personalty after production, but it undertakes to invest the assignee, and we think it does invest her, presently with a right or interest in what the assignor owned"* (emphasis supplied), expressly negatives the commissioner's contention that royalty pay-

---

5. "It does not follow, however, that the instrument does not create an interest in land or that it evidences merely a debt to be paid out of oil produced. The oil and gas lease operated to invest the lessee with a determinable fee in the oil and gas in place. * * * The instrument above set out under which Mrs. Dunn claims follows the form ordinarily used by a lessee in assigning or conveying an interest in the leasehold estate. It is not a promise to pay money. It is not a contract for the sale and delivery of oil as personalty after production, but it undertakes to invest the assignee, and we think it does invest her, presently with a right or interest in what the assignor owned. * * *"

6. "* * * we have directed attention to the fact that the interest assigned to Mrs. Dunn, if not in principle the same as a royalty, particularly an overriding royalty, is very like it. We believe we may take judicial knowledge of the common practice in the industry as to the method of paying royalties or other interests in oil. Many owners of royalties and like interests have no facilities for receiving oil, and the ordinary practice is that the owners of such interests, whether payable in oil or in money, obtain payment in money after executing division orders to pipe line companies or other purchasers of the oil." Tennant v. Dunn, 130 Tex. at page 294, 110 S.W.2d at page 58.

ments are conveyances of the oil as personalty.

In the second place, it is no more sound to say that the carving out of an oil payment out of a working interest and the sale of the oil payment thus carved is a sale of the oil as personalty, than it is to say that the carving of a royalty out of a working interest and its sale is such a sale, and no one, not even the commissioner, has yet been heard to claim that the carving of a royalty out of a working interest places the owner of the leasehold estate in the position of merely selling the oil itself as personalty and, therefore, that the sale was, within the Sec. 117 exception, of property held primarily for sale. Indeed, the commissioner concedes that "an oil payment assignment may sometimes constitute the sale of a capital asset as where a person who owns only an oil payment right sells the entire right." Thus, as applied to the case at bar, though according to the commissioner the taxpayer did not sell Lake a capital asset, Lake somehow acquired one, and if he later sold the whole of what he bought, the purchaser from him would acquire a capital asset, a truly remarkable result.

The commissioner does not enlighten us on whether in the purchaser's hands the oil which Lake would receive from year to year on the wasting capital asset so acquired would be subject to depletion, but we must assume that it would not, since, contrary not to some but to all of the cases on depletion, the commissioner has concluded here that this putative capital asset was depletable in a lump sum in favor of respondent in the year of the sale, even though not a barrel of oil had been then drawn.

Of the commissioner's third contention, that the sale was not of property held for more than six months, it is sufficient to say that the parties have stipulated, and the facts show, that the prop-erties out of which the interest was carved had been held for more than that time and that the commissioner's contention, that the property sold came into existence with, and only with, its assignment, is contrary to legal principles indeed, is little short of legal legerdemain.

This brings us at last to what in our opinion is the crowning inconsistency of the commissioner's whole argument. This is that the government, through the commissioner, has the right and power to remake or reinterpret their contract for the parties, so that, though, according to the teachings of all the cases,[7] the assignee and not the assignor of a mineral interest, under instruments like those here, is entitled to take depletion on it, the commissioner can by his intervention deprive the assignee of his contract right to depletion in the years following and require the assignor to take it all in the year of the sale before the right to it has arisen. Of course, if the instrument transferred an economic interest in the oil, the commissioner cannot do this.

The Court of Appeals for the Seventh Circuit recognized this in the Slagter case in which treating the arrangement there made as a loan and a dedication of the assigned interest in the oil properties to the repayment of that loan, it is held that the assignors were taxable on the transaction not when they obtained the cash paid for the assignment but that the "income in question was taxable as ordinary income of the taxpayers (assignors) as it accumulated and was paid from time to time to Ashland, and that the tax liabilities should be computed for the years in question upon the amounts thus realized and paid to Ashland in the respective periods."

 While we incline to the view that, in its opinion in the Slagter case, the Court of Appeals did not give full effect to the true nature of a limited overrid-

7. Some of these are: Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L. Ed. 1277; Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Caldwell v. Campbell, 5 Cir., 218 F.2d 567; Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343.

78

ing royalty or oil payment interest as announced in Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324, Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, Caldwell v. Campbell, supra, and numerous other decisions of this court, it is not necessary for us to determine whether the case was or was not correctly decided on its facts. It is sufficient to say of it that nothing said in it or in its result gives any aid or comfort to, or in anywise supports the contention of the commissioner, as applied to the facts of this case, and that we are of the clear opinion that the decision of the Tax Court was right and should be affirmed.

Borah, Circuit Judge, dissented in part.