**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**John David HAWN and Bette Hawn, Respondents.**

**No. 15658.**

United States Court of Appeals Fifth Circuit.

March 27, 1956.

Rehearing Denied April 25, 1956.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Melva M. Graney, John Potts Barnes, Chief Counsel, Int. Rev. Ser., Claude R. Marshall, Sp. Atty., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., for petitioner.

Marvin K. Collie, John G. Heard, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for respondent.

Before BORAH, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for review of a decision of the Tax Court holding that an absolute transfer for value of $854,993.-25 in "oil payments" to a transferee until he received $120,000.00 from such payments, with automatic reconveyance to the transferor thereafter, was a sale or exchange of capital assets, and did not, as the Commissioner of Internal Revenue asserted, result in the receipt of ordinary income.

The facts regarding the transfer of the oil payments, all stipulated, may be briefly stated as follows, the husband being referred to as the taxpayer, although joint returns were filed:

On October 1, 1949, taxpayer had owned, for a period of more than six months, an oil payment right in certain oil properties located in Refugio County, Texas. The oil payment right was originally in the amount of $1,000,000. On October 1, 1949, the balance remaining was $854,993.25 and the oil payment right had a zero basis to taxpayer.

Under an assignment dated October 1, 1949, taxpayer assigned and conveyed the oil payment right to A. E. Hinman, a general contractor, as the consideration for the construction of a house on a city lot owned by taxpayer in Corpus

Christi. The granting clause of the assignment provided as follows:

"* * * I, John David Hawn, do hereby grant, sell, transfer, assign and convey unto the said A. E. Hinman all of my right, title and interest in and to said oil payment above described until the said A. E. Hinman shall have received from the proceeds of the sale of said interest in said oil the sum of One Hundred Twenty Thousand ($120,-000.00) Dollars, whereupon the interest herein conveyed to said A. E. Hinman shall terminate and revert to and revest in said John David Hawn, his heirs, representatives and assigns without the necessity of the execution of any character of release or reconveyance."

The further agreement between taxpayer and Hinman for the construction of the house in exchange for the oil payment right was set forth in a letter agreement between the parties as follows:

"Mr. A. E. Hinman
Wilson Building
Corpus Christi, Texas
"Dear Sir:

"In consideration of my assignment to you of an oil payment in the amount of $120,000.00 out of an oil payment in the amount of $1,000,000.00 which was given to me by my grandmother, Mrs. Christie Hewit, which assignment to me is of record in Volume 68, page 107–111 of the Deed Records of Bee County, Texas, you agree to erect for me a one (1) story, ranch type, combination masonry and frame residence to be located in Hewit Estates in Corpus Christi, Texas, pursuant to a contract executed between yourself and me on the 1st day of October, 1949.

"As a part of this agreement you agree to furnish me all bills for materials, labor, furnishings, etc., in connection with the above mentioned residence to the extent of $115,000.00.

"It is understood and agreed that you are financing the furnishing of the above mentioned items with one of the local banks. You are to reimburse yourself for any interest paid out of the difference between the $120,000.00 oil payment and the amount you are paying for the oil payment, namely, $115,-000.00 and any excess of any amount above the $115,000.00 with interest at 5% will be returned to me out of the oil payment.

"Should, however, the amount of $115,000.00 plus interest at 5% exceed $120,000.00 I will personally be liable to you for such amount.

"If the above is in accordance with our agreement will you please execute and return to me the original of this letter.

"Yours very truly,
(S) John D. Hawn
"Accepted: October 1, 1949
(s) A. E. Hinman"

Taxpayer did not receive any note or other security for this contractual obligation of Hinman to construct the house.

The lease to which the oil payment right applied was fully developed and producing oil at the time of the assignment of the oil payment right to Hinman and also when the oil payment right later reverted to taxpayer. The production from the lease was fairly consistent at such time, the allowable production being regulated by the Railroad Commission of the State of Texas, and the field price for the production at the time of the assignment of oil payment right to Hinman was ascertainable. On the basis of information available at the time of the assignment of the oil payment right to Hinman, assuming that the production under the lease continued at its then average rate and that the field price of the production remained substantially the same, it could have been estimated that $120,000.00 would be received from the oil payment right within a period of approximately two years.

On or about May 1, 1951, 19 months after the assignment of the oil payment

right to Hinman, Hinman had received a total of $120,000.00 from the oil payment right directly from the companies purchasing the production. On or about the same date the oil payment right automatically reverted to taxpayer in accordance with the terms of the assignment to Hinman.

In the meantime, the construction of the house had been begun on October 17, 1949. From October 1, 1949, the date of the assignment of the oil payment right to Hinman, through December 31, 1949, Hinman received $12,782.-53 from the oil payment right and spent a total of $20,809.79 in the construction of the house.

The sole question is whether on these undisputed facts the proceeds from the sale, i. e., the value of the house to be built for the taxpayer, were to be treated as capital gains to the taxpayer, with the oil payments received by the contractor being reportable by him as gross income, subject to the normal percentage depletion in his hands. The Tax Court, with six judges dissenting, held in fa-

vor of the taxpayer. Having determined that the oil payments were a species of property, i. e., an interest in realty, the Tax Court concluded that it would automatically follow that a transfer of such property would qualify it as a "sale or exchange of a capital asset." This result does not necessarily follow. The relevant sections of the tax laws, as contended by the taxpayer, are Section 117(a) and (b).[1] The Commissioner calls our attention to the general definition of gross income.[2]

■ It is clearly true, as already indicated, that an oil payment, like royalty, is an interest in property, an interest in realty, an interest in the minerals in place.

This court discussed the effect for tax purposes of a transfer of oil payments for periods of from 9 to 13 years in Caldwell v. Campbell.[3] We there held under its facts that such a transfer for cash and notes constituted a sale of a capital asset, and was not an anticipatory assignment of income.

1. "§ 117. Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include, stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l) * * *.

* * * * *

"(4) [as amended by Sec. 150(a) (1) of the Revenue Act of 1942, c. 619, 56 Stat. 798] Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;

* * * * *

"(b) [as amended by Sec. 150(c) of the Revenue Act of 1942, supra] Percentage Taken Into Account.—In the

case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months."
26 U.S.C.A. § 117.

2. "§ 22. Gross income

"(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"
26 U.S.C.A. § 22.

3. 218 F.2d 567.

The Court of Claims has also played its part in this field, having held in Rudco Oil & Gas Co. v. United States,[4] that under the undisputed facts in that case the declaration as dividends of property in kind in the form of an assignment of the corporation's entire interest in 18 oil leases to the stockholders "until [such] assignees shall have received the sum of [varying figures used here] Dollars" was not effective as a payment of dividends in kind, but was an assignment to the stockholders of the right to receive income to which the corporation was entitled. The assignments in the Rudco case paid out the stated amount in approximately three months.

Respondent strongly urges that we are bound in this matter by a previous holding in Ortiz Oil Co. v. Commissioner of Internal Revenue[5] that an assignment by a producing and drilling company of oil payments representing a proportionate part of production for such time as would be required to yield $359,333.34 in return for a cash payment of $154,000.00 needed by the producer for drilling and development expenses, was a sale of the oil in place and passed to the transferee the duty of reporting the income received and the privilege of taking the percentage depletion deduction. The pay-out in the Ortiz case was just under five years. It is to be noted, however, that the question here litigated was not present in the Ortiz case, since the circumstances there present caused neither the Commissioner nor the Court to question either the completeness of the sale or the effect to be given to it under § 117 under the principle of Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199. The only question there presented and decided was whether the transaction was a loan or a sale, and thus whether transferor or transferee was entitled to the depletion allowance.

The question we here deal with is not free from doubt and it is not one in which the Court can arrive at its decision by looking only at § 117, as so strongly urged by the appellee. The Supreme Court, in such decisions as Helvering v. Horst,[6] Helvering v. Clifford,[7] and Harrison v. Schaffner,[8] and this Court in Farkas v. Commissioner,[9] have both given full recognition to the fact that there are conflicts between the general definition of income[10] and the language of other sections relating to gifts or transfers. For instance, the taxpayer in the cited cases argued with just as much vigor as does the taxpayer here that there was an absolute gift of the coupons,—a species of property—in the Horst case, and that there was a conveyance of an equitable interest in the trust—a species of property—in the Schaffner case. In the latter, the Court said of Helvering v. Horst, supra, and Helvering v. Eubank,[11] (a case involving transfer of earned life insurance commissions):

"* * * Decision in these cases was rested on the principle that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach of the statute taxing income 'derived from any source whatever'. In the light of our opinions in these cases the narrow question presented by this record is whether it makes any difference in the application of the taxing statute that the gift is accomplished by the anticipatory assignment of trust income rather than of

4. 82 F.Supp. 746, 748, 113 Ct.Cl. 206.

5. 5 Cir., 102 F.2d 508.

6. 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75.

7. 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

8. 312 U.S. 579, 61 S.Ct. 759, 760, 85 L.Ed. 1055.

9. 170 F.2d 201.

10. See note 2, supra.

11. 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81.

interest, dividends, rents and the like which are payable to the donor."

Likewise, in deciding the Farkas case in favor of the contention of the taxpayer that an assignment of his entire income from a testamentary trust to a trustee for the benefit of others, for the life of the trustee, but to terminate "within ten years" was effective to cause the income to be taxable to the transferee instead of the taxpayer, this Court recognized that considerations other than a mere absolute assignment of an equitable right in the estate were needed to achieve this result. We there based the decision on three grounds [170 F.2d 204]:

"* * * (a) the decisions and admissions show that the interest transferred was an equitable interest in the testamentary trust estate; (b) there was a complete renunciation by the settlor of any benefit or control of the property; (c) the trust was not one of an unreasonably short duration but was for a large portion of settlor's life expectancy * * *."

In all of these cases, therefore, it is apparent that the courts have held income is still taxable to various kinds of transferors, notwithstanding the fact that a transfer, complete and in good faith, has been made to another. There is no different rule of law that requires the court to give any greater degree of finality to a transfer which apparently fits under § 117, than to one made under the terms of the gift sections of the law.[12]

█ The previous court decisions by which our actions are circumscribed clearly teach that if, in truth, a transfer of a part of future income merely puts in the transferee a right to collect such a part of the total future income as is insubstantial either in relation to the total amount receivable or to the time during which it will be received, such transfer does not make it the income of the transferee for tax purposes.

█ Deciding, as we do, that not every transfer of oil payments, even for a valuable consideration, amounts to a sale of capital assets under § 117, it becomes necessary for us to determine whether, under the established principles, this transaction was or was not such a sale. Upon careful review of the cases and equally careful consideration of the circumstances of this particular transaction, we conclude that this was not such a sale, but was, rather, an assignment of anticipated income which remained taxable to the respondent.

█ Upon the authority and reasoning of the cases previously decided by this Court, we are committed to the proposition that a transfer for value of such oil payments for periods ranging from 9 to 13 years, under the particular facts of that case, constituted a sale of capital assets. Caldwell v. Campbell, supra. We are also committed to the proposition that, in a determination as to whether a transfer of an interest in property in trust is given effect taxwise as passing the liability for tax on income to the transferee, we are to consider the substantiality of the transfer and that the duration of the estate covered by the transfer is an element of such substantiality. Farkas v. Commissioner of Internal Revenue, supra. We

12. It is implicit in the opinion of the Supreme Court in Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, that the mere fact that an economic asset may be property under normal concepts, does not necessarily constitute it a "capital asset" under Section 117. The Court says: "Where, as in this case, the disputed amount was essentially a substitute for rental payments which § 22(a) expressly characterizes as gross income, it must be regarded as ordinary income, and it is immaterial that for some purposes the contract creating the right to such payments may be treated as 'property' or 'capital.'" 313 U.S. at page 31, 61 S.Ct. at page 758.

See also, for a discussion of the use of the same terms in a different sense in separate sections of the Internal Revenue Code, the dissenting opinion of Judge Frank in McAllister v. Commissioner of Internal Revenue, 2 Cir., 157 F.2d 235, 237.

find that in the Caldwell case the opinion of this Court distinguished the Rudco Oil & Gas Company case, supra, in no way disagreeing with or criticizing the decision of the Court of Claims under its undisputed facts in holding that a transfer of oil leases for three months did not effect a transfer of property in kind. Finally, we are, of course, bound by the decision of the Supreme Court in Harrison v. Schaffner, supra, in which the Court, applying the principles upon which we must here act, held that a complete gift of the entire income from a trust—a gift of property, as we have pointed out above—for one year amounted only to an anticipatory assignment of income.

Here there was in form a complete assignment of the entire property right —oil payments of a total amount of $854,993.25—to permit realization by the transferee of a minimum of $115,000.00 and a maximum of $120,000.00 under circumstances that caused the parties to stipulate that if existing conditions and existing field price for the oil remained constant it could have been estimated that the $120,000.00 would be received within approximately two years. Actually the amount was paid out in one year and seven months. The taxpayer contends that the uncertainty of production or price or both made it too uncertain that the pay-out period would be as short as two years for us to consider the time element. He also asserts that the uncertainty was a controlling factor in determining whether the transaction was an assignment of assured income or a sale of an asset of uncertain value. We think a complete answer to this contention lies in the documents themselves. While the Court might not be permitted to indulge the presumption that the contractor was ob-

ligated to furnish a house of the substantial value of $120,000.00 (including interest on borrowed money) in return for the $120,000.00 oil payment, the parties specified that the amount Hinman was paying for the oil payment was $115,000.00 and the remaining $5,000.00 was to be available to him for interest charges.[13] Thus it is apparent that what would normally be assumed from this transaction was actually specified, i. e., that a house of the value of $115,000.00 was being "paid" to Hawn in return for $115,000.00 plus an undetermined amount for interest, of oil payments. Thus, it seems, the parties themselves, by their agreement, removed the argument of uncertainty either as to amount or duration of payments.

Where the legal effect to be given for tax purposes to what appears in form to be a transfer of an interest in property is raised, we have the clear teaching of the cases already cited that we must determine whether such transfer is for a substantial interest in the total property owned by the transferor. Although it might be better if Congress provided the answer, in the absence of a Congressional determination, it devolves on the Court to supply it.

■ In light of the decided cases, we hold that the transfer of enough of the total of $854,993.25 oil payments to the contractor to pay him to build a $115,000.00 home for taxpayer and enough more to reimburse him for interest paid by him, is the transfer of so much of the taxpayer's income, and not a sale of a capital asset.

The result reached here is also required by the nature of the transaction between the parties. The agreements showed that the parties contemplated using the oil payments over the next two years for the construction of a house

---

13. In the letter contract, the following appears:
"It is understood and agreed that you are financing the furnishing of the above mentioned items with one of the local banks. You are to reimburse yourself for any interest paid out of the differ-

ence between the $120,000.00 oil payment *and the amount you are paying for the oil payment, namely, $115,000.00* and any excess of any amount above the $115,000.00 with interest at 5% will be returned to me out of the oil payment." (Emphasis supplied.)

for Hawn. It was clear that the expenditures by the contractor might be made faster than oil payments were received, so part of the agreement was that Hawn should pay the interest on any funds borrowed by the contractor for the construction. The effect was the same as though Hawn had borrowed the funds required, using the oil payments as collateral and applied the proceeds of such loans to pay the contractor, and then repaid his loans as the oil payments were received. Here this was accomplished and substantially the same thing was done through the person of the contractor. The government contends that the whole arrangement made the contractor the agent for Hawn in the building of his house. While we need not cast it in this mold, we do find that the course of dealings did not amount to a sale or exchange of capital assets under section 117.

The decision of the Tax Court is reversed and the case is remanded for disposition consistent with this opinion.