Frank SCOFIELD, Former Collector of Internal Revenue, Appellant,

v.

Dennis M. O'CONNOR and Katherine O'Connor, Independent Executors of the Estate of Thomas O'Connor, Deceased, and Dennis M. O'Connor, Katherine O'Connor, Mary O'Connor Braman, Joined by her husband, D. H. Braman, and Thomas O'Connor, Jr., Appellees.

No. 16253.

United States Court of Appeals Fifth Circuit.

Feb. 1, 1957.

John N. Stull, Acting Asst. Atty. Gen., Charles K. Rice, Asst. Atty. Gen., Melva M. Graney, Hilbert P. Zarky, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., M. Harman Parrott, Asst. U. S. Atty., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellant.

J. Paul Jackson, Dallas, Tex., F. C. Proctor, Victoria, Tex., for appellees. Robertson, Jackson, Payne, Lancaster & Walker, Dallas, Tex., Stofer, Proctor, Houchins & Anderson, Victoria, Tex., of counsel.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HUTCHESON, Chief Judge.

One of several appeals [1] from judgments entered in favor of taxpayers, after Caldwell's case [2] and before Hawn's case [3] had been decided here, this appeal presents the single question whether, in the light of those cases, a transaction involving oil payments carved out of royalty interests was, as claimed by the taxpayer and found by the trial court, a sale of a capital asset, or was, as claimed by the commissioner an anticipatory assignment of income.

---

[1]. Fleming v. Commissioner, 24 T.C. 818; Wrather v. Commissioner, —— T.C. ——; Weed v. Commissioner, 24 T.C. 1025; Lake v. Commissioner, 24 T.C. 1016.

[2]. Caldwell v. Campbell, 5 Cir., 218 F.2d 567.

[3]. Commissioner of Internal Revenue v. Hawn, 5 Cir., 231 F.2d 340, 341.

Making no attack upon Caldwell, in fact conceding in oral argument that it was correctly decided, appellant's whole effort is directed to bringing us into agreement with his contentions: that in Hawn's case this court *held* that, though Congress had provided no standard or guide, this and other courts, by the use of a kind of slide rule method not clearly if at all revealed in the decision, could, in their uncontrolled discretion, determine as a fact in each case whether a sale of an oil payment interest is or is not too insubstantial to qualify for capital gains treatment under Section 117, 26 U.S.C.A. § 117; and that, in the exercise of this fact finding power, we should hold as a fact that, because of the insubstantiality of the transaction, the sale made here was not a sale.

It is taxpayer's position: that this court did not in Hawn's case in anywise qualify or limit Caldwell; that it particularly did not hold that, without a legislative standard to guide its decision, it had the power to determine in each case, as a fact, whether an assignment would or would not be regarded as insubstantial; and, finally, that Hawn's case was decided not on the ground of the factual insubstantiality as such of the property purportedly sold, but on the ground that the facts as a whole did not. in law show a sale of property at all but only a loan arrangement.

In support of its view that the court did not intend to lay down any slide rule method of factually determining in each case the insubstantiality of a transfer, but that the case was determined on the ground that, upon its whole facts, what took the form of, was not in fact and in law, a sale, the taxpayer points to the decisive holding of the court [231 F.2d 346]:

 " * * * The agreements showed that the parties contemplated using the oil payments over the next two years for the construction of a house

for Hawn. * * * The effect was the same as though Hawn had borrowed the funds required, using the oil payments as collateral and applied the proceeds of such loans to pay the contractor, and then repaid his loans as the oil payments were received. * * * "

So pointing, he urges upon us that since, as was held in that case, there was no sale but only a loan transaction, the court did not, as the commissioner urges it did, establish, or even undertake to establish, a slide rule for determining insubstantiality as to a bona fide sale, which, upon the stipulated facts and the findings of the trial court, the sale in question here was.

It is true that this court, thus properly deprecating the absence of legislative guide or standard:

 "Although it might be better if Congress[4] provided the answer, in the absence of a Congressional determination, it devolves on the Court to supply it."

did state that, along with other facts going to the legal effect of the transaction as a whole, the court should determine "whether such transfer is for a substantial interest in the total property owned by the transferor".

It is equally true, however, that it did not undertake to decide the Hawn case on, or in it lay down, any quantitative rule or other guide, fractional or otherwise, for the factual determination by the court in that or any other case as to what would or would not be substantial. Neither did it undertake to hold that if, instead of a fictional or pretended sale, as the court found that the purported sale was, there had been a real sale of an oil payment of $115,000, the court would have been authorized to hold or would have held, that it was insubstantial in amount and, because and only because thereof, it was not a sale.

4. The Mills Bill, H.R. 9559, dealing prospectively with oil payment sales and related transactions, introduced in the last congress but not passed, illustrates the desirability of legislation to bring about certainty and clarity in this important area of the tax law.

To the contrary, stating:

"It is clearly true, as already indicated, that an oil payment, like royalty, is an interest in property, an interest in realty, [and] an interest in minerals in place."

and declaring:

"Deciding, as we do, that not every transfer of oil payments, even for a valuable consideration, amounts to a sale of capital assets under § 117, it becomes necessary for us to determine whether, under the established principles, this transaction was or was not such a sale."

the court went on to say:

"Upon careful review of the cases and equally careful consideration of the circumstances of this particular transaction, we conclude that this was not such a sale, but was, rather, an assignment of anticipated income which remained taxable to the respondent."

This is to say, that the court, correctly concluding, on the whole facts, not that there was a bona fide sale which, because in amount it was insubstantial, did not come within Section 117, but that this was not a sale at all, it was a credit arrangement, which, though in form an assignment of the oil interest it purported to deal with, was in fact and in law nothing but an anticipatory assignment of income made as security for, and in payment of, Hawn's debt to the contractor, as correctly *held* that the course of dealings did not amount to a sale or exchange of capital assets under Section 117.

We, therefore, agree with the taxpayer that if, as commissioner contends, this court in the Hawn case did, and we should, without a legislative standard or guide, determine as matter of fact whether and where a time limit was to be drawn upon whether a sale of oil payments was substantial or insubstantial enough to constitute a sale entitling taxpayer to capital gains treatment, the result would be not deciding but mere fiating, or at best, unwarranted judicial legislation.

█ If, however, on the other hand, as the Hawn case held and we hold, the court in each case takes all of the facts into consideration for the purpose of determining whether, as matter of law, a transaction was or was not a sale of capital assets, so as to entitle it to capital gains tax treatment under Sec. 117, the court would only be following and applying the rule laid down in the cases, that not every sale of capital assets, but only those which in law come under the statute, will support capital gains treatment,[5] and that it would be running a good principle into the ground if a taxpayer would be allowed to claim as a sale of capital assets the daily use of small portions thereof in connection with his business and the payment of his day to day expenses.[6]

---

5. Rudco Oil & Gas Co. v. United States, 82 F.Supp. 746, 113 Ct.Cl. 206, "a case", as we pointed out in Caldwell v. Campbell, 5 Cir., 218 F.2d 567, 570, "of a corporation dealing deviously through its stockholders * * *". * * * " It was in effect a mere appointment of the stockholders to receive the mineral income of the corporation for sixty or ninety days of the taxable year in which the purported transfer was made. It was, therefore, a completely abortive attempt, like those dealt with in the Horst [Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75], the Harrison [Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055], and the Eubank [Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81] cases, to change the statutory rule for the taxation of income by appointing one to collect as his own the income of another."

6. Cf. what is said by the Supreme Court in Burnet v. Harmel, 287 U.S. 103, 53 S. Ct. 74, 77 L.Ed. 199, arguendo and by decision, and in Corn Products Refining Co. v. Commissioner, 350 U.S. 46, at page 52, 76 S.Ct. 20, at page 24, 100 L.Ed. 29:

"* * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not

That the transaction in this case was not of an insubstantial kind is shown, by the fact that it involved a cash sale for $9,990,350 of an oil payment conveying 4,000,000 barrels of oil in place, and by the undisputed facts and the oral testimony of two witnesses, the government's brief stating, "The oral testimony is uncontradicted and accordingly there are no disputed facts".

It is further shown by the definite and precise findings of the district court which, after setting out the full transaction, categorically and specifically, found that the transaction was a bona fide and effective sale.[7] Based upon these findings of fact, he concluded as matter of law:

"The transaction with D. E. Blackburn was a bona fide sale.

"The sale to Blackburn was a sale of a royalty interest in producing oil properties in Texas, subject to a revision to plaintiffs after the royalties had produced in Blackburn's hands the prescribed amount. This was a sale of what is commonly called an oil payment. This oil payment was a real property interest under the law of Texas, and, under the tax laws, a property interest in oil in place. The transaction was not intended to be and was not, as a matter of fact or a matter of law, an assignment of income, but was the sale of a property interest to Blackburn, which property interest produced income in the hands of Blackburn. This property interest was substantial and real, representing a substantial part of the grantor's

the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106, 53 S.Ct. at page 75."

7. "Both the sellers and the buyer (D. E. Blackburn) intended the transaction in question to be a sale and purchase of the royalty interests in question. They did not intend to enter into a loan or a mortgage transaction. At no time did the Executors, individually or in their fiduciary capacity, make any guaranty or agreement to indemnify the purchaser or enter into agreements with the purchaser other than the agreement to sell, as set forth in the deed. At all times, the risks incident to the presence and production of sufficient quantities of oil to make the transaction profitable for the purchaser were upon the purchaser. The purchaser, D. E. Blackburn, borrowed the purchase money from Chase National Bank of New York, giving his note and deed of trust on the properties purchased by him. The bank dealt only with Blackburn and looked only to him. The plaintiffs did not have anything to do with Blackburn's bank loan. The transaction in question was real and bona fide and was, in no sense, a sham or a subterfuge. Blackburn made a substantial profit on the transaction and reported and paid tax on his profit.

"The purpose of the sale of the oil payment was a bona fide business purpose,

to-wit, to raise money to pay federal estate taxes and state inheritance taxes, due by reason of the death of Thomas O'Connor, deceased, and to pay administration expenses of the Estate. The Estate was in need of cash resources with which to pay these charges and for these reasons the oil payment was sold.

"The sale in question was the first and only sale of oil payments or other mineral interests that the Estate had made until that time. Neither the decedent, Thomas O'Connor, nor his Estate, was in the business of selling oil payments or other mineral interest. The limited royalty interest, the oil payment in question, was not held primarily for sale to customers.

"The oil payment 'paid out' after three years of production, during which the properties were owned by Blackburn. The oil payment would have taken an appreciably longer period to pay out had it not been for the fact that there was an increase in the production in the field by the operating lessees and had it not been for the further fact that there had been a substantial increase in the price of oil shortly prior to the sale of the oil payment, which higher price was maintained during the period of the pay-out.

"The royalty interest (or oil payment) sold to Blackburn represented a substantial part of the plaintiffs' oil in place. Also, in terms of the relative values of the interest sold and of the revisionary interest retained by the sellers, the transfer represented a substantial part of the sellers' royalty interest."

royalty interest. The property so sold was a long-lived, and not a short-lived, oil payment.

"The property interest so sold to Blackburn was a capital asset as defined in Sec. 117 of the Internal Revenue Code of 1939, and this capital asset had been held by plaintiffs for more than six months."

 It will serve no useful purpose for us to set out here the undisputed facts on which the findings and conclusions were based. It will be sufficient to say that, on the record made, the district judge was right and his judgment should be affirmed.