Ellis CAMPBELL, Jr., District Director of Internal Revenue, Appellant,

v.

David FASKEN and Inez G. FASKEN, Appellees.

No. 17235.

United States Court of Appeals Fifth Circuit.

June 12, 1959.

Rehearing Denied July 20, 1959.

John R. Brown, Circuit Judge, dissented.

Marvin W. Weinstein, Melva M. Graney, Joseph F. Goetten, Lee A. Jack-son, Attys., Dept. of Justice, Washington, D. C., John C. Ford, Asst. U. S. Atty., Dallas, Tex., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, Washington, D. C. (Heard L. Floore, United States Attorney, Ft. Worth, Tex., on the brief), for appellant.

Richard S. Brooks, Midland, Tex., Harry C. Weeks, Fort Worth, Tex. (Whitaker & Brooks, Midland, Tex., Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel), for appellees.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

David Fasken and his mother, Inez G. Fasken, brought suit against the District Director of Internal Revenue claiming a refund of income taxes for the years 1949 and 1950 and interest. Judgment for them was entered by the district court. From that judgment the district director has appealed. The Faskens, mother and son, who will be herein referred to as the taxpayers, owned approximately 165,000 acres in Andrews and adjacent counties in Texas. These lands were held by the taxpayers as partners, with David Fasken owning a 75% interest and Inez G. Fasken holding the remaining 25%. In 1949 the taxpayers entered into two agreements, one being made with Forest Oil Corporation and the other with Stanolind Oil and Gas Company. Two agreements were made by the taxpayers in 1950, one being with Stanolind Oil and Gas Company and another with Anderson-Prichard Oil Corporation. In most respects these agreements were similar.

By each of the agreements the taxpayers agreed to convey to the oil company an undivided 45% interest "in and to the oil, gas and other minerals in and under and that may be produced from" the lands described in the agreement, "down to and including a depth of 5500 feet from the surface, all minerals below such depth being retained by" the taxpayers. Mineral deeds, in the conventional Mid-continent T Form, which described, in the aggregate, the 45%

mineral interests in all of the lands covered by the agreement, were executed by the taxpayers and placed in escrow with a bank. The delivery was accompanied by instructions to deliver each deed to the oil company upon the receipt by the bank of an affidavit made by an officer of the oil company showing that an oil well had been commenced on the particular tract and upon the payment by the oil company for the account of the taxpayers of the agreed price for such tract. The Forest agreement fixed the price on the basis of $12,500 for each forty-acre tract; Stanolind's 1949 agreement required it to pay $37,500 for the forty-acre tracts; the price as fixed in each of the 1950 agreements was $25,000 for each forty acres. Each of the agreements with the exception of the 1949 Stanolind agreement, gave the oil company an option to acquire 45% interest in the minerals upon other lands. The price to be paid for the interests acquired pursuant to exercising an option was, in all cases, the sum of $25,000 for each forty acres. Each agreement provided that the oil company should commence the drilling of a well within 30 days from the date of the agreement and upon the completion of a well on one forty-acre tract, to begin within 30 days, the drilling of another well on a different forty-acre tract. On the completion of each producing well the taxpayers were to pay the oil company the sum of $25,000 which was recited to be in payment of the taxpayers' 55% share of the drilling cost. If a well was not completed as a producing well the taxpayers were to pay the oil company an amount equal to 55% of its cost, but not more than $25,000.

The oil company was given charge of production. If the price of oil was $1.01 per barrel or more the taxpayers paid 20 cents per barrel as its share of operating costs. If the price of oil was under $1.01 per barrel the operating costs were prorated on a 55–45 percentage basis. The net proceeds from equipment salvaged from abandoned wells was to be divided into the same ratio. The oil com-

panies were authorized to market the taxpayers' 55% share of the oil for their account or to purchase it at prevailing field prices. Accounting procedures were stipulated in detail.

In 1949 deeds of the taxpayers were delivered to Forest covering, in the aggregate, eight tracts of forty acres each, covered by the agreement, for $100,000 and five tracts of forty acres each, acquired pursuant to option, for $125,000. In 1950 a deed of the taxpayers was delivered to Forest covering one forty-acre tract for $25,000. In 1949 Forest completed twelve wells and for its share of the drilling costs the taxpayers paid Forest $25,000 per well or $300,000. In 1950 Forest completed one well and the taxpayers contributed $25,000 toward its drilling cost. The pattern of the Forest transactions was, in general, followed in the dealing between the taxpayers and the other two oil companies. Under the first Stanolind contract deeds of the taxpayers for fractional mineral interests in the eight forty-acre tracts covered by the agreement were delivered in 1949 to Stanolind for which the taxpayers received $37,500 for each forty, or a total of $300,000. On each of these eight tracts Stanolind completed a producing well in 1949, and the taxpayers paid $200,000 to Stanolind as their share of the drilling cost. Under the second Stanolind contract deeds of the taxpayers were delivered in 1950 for an aggregate of nine forty-acre tracts for which the taxpayers received $225,000. On these tracts eight wells were completed in 1950 and in that year the taxpayers paid Stanolind $200,000 as their share of the drilling costs. In 1951, a tax year not involved in these proceedings, a ninth well was brought in and in that year the taxpayers paid Stanolind $25,000 as their share of the cost of drilling it. Deeds for fractional mineral interests were delivered by the taxpayers to Anderson-Prichard in 1950 covering thirteen tracts of forty acres each for a total consideration, paid that year, of $325,000. During that year Anderson-Prichard completed eleven wells. The taxpayers

made drilling cost payments on nine of these, in 1950, in the amount of $225,000. In 1951 two other wells were completed. On these, and on two of the 1950 wells, the taxpayers made payments in 1951 of their share of drilling costs in the amount of $100,000.

In their income tax returns the taxpayers reported the amounts received from the oil companies upon the deliveries of deeds as capital gains. They reported the amounts received from their share of the oil production as ordinary income. The taxpayers allocated the amounts paid to the oil companies for their share of drilling costs between intangible drilling and development expense and depreciable tangible equipment costs. They deducted the amounts allocated by them to intangible drilling and development cost, depreciation on their part of tangible equipment, some geological expense which they had incurred, their proportionate share of the cost of operating the wells, and the statutory depletion deduction on their share of production. The oil companies treated the amounts paid upon the deed deliveries as cost of the mineral interests which the deeds purported to convey. The amounts which the companies treated as tangible and intangible drilling costs were reduced by the amounts paid to them by the taxpayers. There was thus a consistency of treatment of the various items of receipts and disbursements by the taxpayers on the one hand and the oil companies on the other.

In the 90-Day Letters to the taxpayers which gave notices of deficiencies in the 1949 taxes, the Commissioner of Internal Revenue recited a determination, "in substance and effect as distinguished from form and appearance", that the taxpayers transferred to Forest the mineral interests conveyed that year, plus $75,000, in consideration of the drilling and equipping of twelve wells, and that the "exchange" of checks, to the extent of $225,000, would be disregarded. As to the Stanolind transactions in 1949, the Commissioner determined that the taxpayers transferred to Stanolind the mineral interests conveyed for a consideration of $100,000 plus the drilling and equipping of eight wells, and that the "exchange" of checks, to the extent of $200,000, would be disregarded. The amount of $75,000, paid by the taxpayers to Forest in excess of the sums they received from Forest, was apportioned by the Commissioner between depreciable drilling costs and deductible intangible drilling expenses. The Commissioner disallowed the taxpayers' claims as to the remainder of these items as reported. The amount of $100,000, received by the taxpayers from Stanolind in 1949 in excess of the sums they paid to Stanolind, was treated by the Commissioner as capital gains. The Commissioner rejected the rest of the taxpayers' claims for capital gains. The taxpayers paid the deficiencies as determined by the Commissioner and brought suit to recover. Oral findings and conclusions were made by the district court at the end of the trial. Among other things it was said:

"* * * the Court would be derelict in a proper scrutiny to pronounce these contracts between the plaintiffs and Stanolind and Forest as methods for defeating and merely covering up agreements so as to defeat the power of the Government to get its proper tax from the citizen. These contracts that were made with these drilling companies by the plaintiffs were in good faith and actually expressed not only the intention of the parties but the carrying out of each particular contract which followed and accompanied a warranty deed for the drillers."

In appealing from the judgment, the Government urges that the district court gave effect to form and ignored substance, that form should be ignored and effect given to substance and that in so doing the agreements between the taxpayers and the oil companies must be treated as leases rather than as sales.

The Government reminds us that in the field of taxation the realities and substance of written documents are to be regarded rather than their form.

This principle is well established. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226; Haley v. Commissioner, 5 Cir., 1953, 203 F.2d 815. But, as has been said, "Form alone takes, and holds and preserves substance." The form of the instruments cannot be wholly ignored in seeking to ascertain their realities and substance even though it is not controlling. West v. Commissioner, 5 Cir., 1945, 150 F.2d 723, certiorari denied 326 U.S. 795, 66 S.Ct. 488, 90 L.Ed. 484; rehearing denied 327 U.S. 815, 66 S.Ct. 679, 90 L. Ed. 1039, rehearing denied 328 U.S. 877, 66 S.Ct. 1008, 90 L.Ed. 1646, rehearing denied 328 U.S. 881, 66 S.Ct. 1359, 90 L.Ed. 1648; Albritton v. Commissioner, 5 Cir., 1957, 248 F.2d 49; Umsted v. Commissioner, 8 Cir., 1934, 72 F.2d 328. The transactions between the taxpayers and the oil companies were cast in the form of sales of undivided interests. The taxpayers say to us that the transactions in legal effect, the realities and the substance, have resulted in sales and not in leases, and that the stated payments for the recited transfers were considerations for bona fide sales.

Facts are stubborn things, they are rigid, and the shape of them is not always such that they will snugly fit into the technical contours of legal pigeonholes. But in this case it is not necessary that they do so. The transaction before us partakes of some of the characteristics of both a lease and a sale. Such was the case in West v. Commissioner. In that case the Wests sold land to an oil company, including the underlying oil, gas and other minerals, subject to certain outstanding royalty interests and reserving to themselves certain overriding royalties. The oil company agreed to drill "with reasonable diligence" and to operate four drilling rigs on the lands involved. The Tax Court held that, in legal effect the transaction amounted to a lease of the minerals. 3 T.C. 431. This Court affirmed. West v. Commissioner, supra.

In the West case,

"The purpose of the transaction was the production of oil; and, to that end, the Wests retained the legal title to an undivided interest in the oil in place and contemporaneously stipulated for an income-producing operation 'resembling a manufacturing business carried on by the use of the soil.'" 150 F.2d 726–727.

In the West opinion it was also stated,

"In other words, the fact that the instruments of transfer passed only a fractional mineral interest, retaining the remaining portion thereof is not controlling in determining the legal relationship created between the parties. It must also be considered that the properties conveyed were in part actual and in part probable producers of oil; that the transferee was engaged in the oil business, and was interested in the properties only for the purpose of developing the minerals; that one of the objects of the transferors was to secure full development of the minerals; that the transferee was contractually obligated to develop; and that the transferors, though securing to themselves so valuable a covenant, were chargeable with no part of the costs thereof." 150 F.2d 727.

It may be that the clause relating to the securing of development without cost to the transferor does not apply to all or parts of the transactions before us, but if not, there would be no such significant difference as would prevent the foregoing from being applicable to this case.

 We think the West case is a controlling precedent upon the facts before us. It has been many times cited with approval and the principle it announces is sound. The judgment of the district court must be reversed. We are in agreement with the Commissioner that

the transactions between the parties resulted in leasing arrangements rather than sales. We do not adopt the Commissioner's contention that the payments to and by the Faskens should be disregarded pro tanto. The Commissioner disallowed the deductions claimed by the taxpayers for their payments to the oil companies merely because, the Commissioner reasoned, the cash payments made by the Faskens should be disregarded to the extent that they could be offset by the payments previously made to them by the companies; this on the theory that, taken as a single transaction, the money payments should cancel each other out rather than treating the funds received by taxpayers as taxable capital gains and the funds paid out by them as drilling and equipment costs. Since we hold, as was held in West v. Commissioner, supra, that the transactions were in the nature of leases, it follows, as was precisely held in the West case, that the initial payments to the Faskens must be treated as lease bonuses or advance royalty payments. As such they are to be taxed as ordinary income subject to depletion allowance. As the initial cash payments to the Faskens are to be treated as income to them as under leases, so should the amounts subsequently paid out by them be given effect by the allowance of appropriate deductions. The Commissioner and the taxpayers have stipulated as to the proper allocation between intangible drilling and development costs and tangible equipment charges. There is no question raised as to the tax treatment to be given to the Faskens' share of the oil produced.

In order that a judgment may be entered giving effect to the conclusions herein expressed, the judgment of the district court is reversed and the cause remanded.

Reversed and remanded.

JOHN R. BROWN, Circuit Judge (dissenting).

I am in full agreement with one pronouncement by the Court: facts are stubborn things. They are stubborn because they are facts. Because they are facts, they cannot yield. Ideas may twist, theories may bend, contentions may yield, but a fact—if it is really a fact—remains rigid and changeless.

With all deference I think the Court reaches the result it does because it does not heed its own insistence that facts are stubborn and rigid things—and in reaching conclusions it confuses fact with contention.

*Fact One:* The opinion states "We are in agreement with the Commissioner that the transactions between the parties resulted in leasing arrangements rather than sales."

The Commissioner has determined no such thing, either expressly or impliedly. On the contrary, what the Court has done is accept the theory advanced for the first time in this old litigation, advanced not by the Commissioner but by the Department of Justice, the effect of which is to completely change horses in the middle of the stream. The importance of this is not in the seemingly unquestioned right of the Government—unlike many private litigants—to change its theories as exigencies demand. Its importance is to point out that the Court is reaching a result supposedly on the basis of a fact finding and determination by the Commissioner which the Court alone sires. A discussion of this is more helpful if we move on.

*Fact Two:* The opinion then states "We do not adopt the Commissioner's *contention* that the payments to and by the Faskens should be disregarded pro tanto." It is not the Commissioner's *contention* that this is so. This is the one and only determination which the Commissioner has made. It is solely because of this *determination*—not a contention—that a deficiency notice was sent or an additional tax paid and refund sought.

Now that is, it seems to me, of extreme importance in view of our unique and limited function. The result of this is that the Court treats as found by the Commissioner a fact completely contrary to his actual determination, and as

though it was our function to find facts, the Court disregards the Commissioner's actual determination. This is done, too, in the face of the unchallenged principle that the findings of the Commissioner are presumptively correct and the burden of overcoming them rests upon him who would upset them. 10 Mertens, Law of Federal Income Taxation § 58A.35.

The simple fact is that everything the Commissioner did in his determination was inconsistent with a supposed lease, and his treatment was entirely consistent with that of a capital gains transaction. It is true that in doing so, he first disregarded the payments to and from the Oil Companies and Fasken on the reasoning—which all of us reject as unfounded—that somehow these things would wash themselves out. This theory presumably was too much for the Department of Justice to defend as this treatment, when the figures are set out in their stark reality,[1] simply had to ride roughshod over two well-accepted principles of income tax law, (a) receipt of funds under a claim of right,[2] and (b) reporting income on an annual basis.[3]

This brings us to precisely what is, and what is not, involved in this case so far as it was made between the Taxpayers and the Commissioner. By this process of mutual extinguishment—of a wiping out of payment tit for tat—which neither we nor the Department of Justice undertake to justify, the Commissioner was not concerned with *increasing* matters of *income*. All he was concerned with was *reducing* items of *deduction*. Wiping out the payments by the Faskens back to the Oil Company to the extent received enabled the Commissioner to determine that the Taxpayers had never paid those items—stipulated to be just and reasonable and properly apportioned—which had been

1. The respective amounts "received from" the Oil Companies by the Faskens and the amounts "paid to" the Oil Companies by Faskens was as follows:

| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|
| | Forest Oil Corporation | | Stanolind Oil and Gas Company | | Anderson-Prichard Oil Corporation | |
| Taxable Year | Received From | Paid To | Received From | Paid To | Received From | Paid To |
| 1949 | $225,000 | $300,000 | $300,000 | $200,000 | Nil | Nil |
| 1950 | 25,000 | 25,000 | 225,000 | 200,000 | $325,000 | $225,000 |
| 1951 | | Nil | | 25,000 | | 100,000 |
| Totals | $250,000 | $325,000 | $525,000 | $425,000 | $325,000 | $325,000 |

2. See Healy v. Commissioner, 1953, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007; United States v. Lewis, 1951, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Moore v. Thomas, 5 Cir., 1942, 131 F.2d 611; Commissioner of Internal Revenue v. Alamitos Land Co., 9 Cir., 1940, 112 F. 2d 648.

For example, in the year 1950 Faskens received under unlimited claim of right from Stanolind $225,000 and paid back only $200,000, note 1, column (d) and (e). Likewise, in 1950 Faskens received from Anderson-Prichard $325,000 and paid out only $225,000, leaving a "credit" advantage of $100,000, note 1, column (f) and (g). The Commissioner disregarded these two sums aggregating $125,000.

3. Burnet v. Sanford & Brooks Co., 1931, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383; Aluminum Castings Co. v. Routzahn, 1930, 282 U.S. 92, 51 S.Ct. 11, 75 L.Ed. 234; United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

The Commissioner paid little heed to the time of receipt and payment. The year 1949 stands on its own for tax purposes. The Anderson-Prichard payments, note 1, Columns (f) and (g), are lumped together so that the receipts in 1950 totaling $325,000 wipe out the payments of like amount which were made in two years.

deducted as the Taxpayers' portion of intangible drilling expense and depreciation on tangibles.[4]

In the course of doing this, the Commissioner took several steps which were utterly and completely contrary to the Commissioner treating "the transactions between the parties [as] leasing arrangements rather than sales," as the Court says he did.

First, the Commissioner treated the $100,000 "excess" received from Stanolind in 1949 as capital gains. This excess resulted from the fact that in 1949 Stanolind paid the Faskens $300,000 (column (d)) while Taxpayers paid back only $200,000 (column (e)). I would suppose, as the Court states, "that in the field of taxation the realities and substance of written documents are to be regarded rather than their form." But I would not suppose that merely by the circumstance that a momentary theory produces greater revenue enables one to treat the transaction as having the characteristics of one type of contract and, in the next moment because of its revenue disadvantages, treating it as something else. And yet that is precisely what the Commissioner did and this Court does nothing to undo it.

Second, the Commissioner treated the Forest "underage" as a payment entitling the Faskens to their pro rata deduction for intangible drilling expense and depreciation on tangibles. This resulted because in the year 1949 the Faskens received from Forest Oil only $225,000 (column (b)) whereas they paid out to Forest $300,000 (column (c)). The Com-

missioner therefore considered that under this uniform transaction which this Court treats as a lease, Taxpayers had made legitimate and deductible payments as intangible drilling expense plus investment in depreciable tangibles.

Third, as the Court points out, the contracts specified that the parties agreed on a fixed formula for Taxpayers' share of operating costs after production. The contracts fixed the rate of 20¢ per barrel if the price of oil was $1.01 per barrel or more, and if less, on a pro rata 55/45% basis.[5] The Commissioner allowed in full all of the payments made by Taxpayers to the three Oil Companies in the joint operating expense of the producing wells.

As I discuss more fully hereafter, a lessor under an oil and gas lease does not pay any portion of the cost of producing oil from a producing well. West v. Commissioner, 5 Cir., 1945, 150 F.2d 723—thought to be the alpha and omega of this case—does not, and could not, with fidelity to oil and gas operations, undertake to make any such declaration. If and to what extent it is binding in an utterly different situation, I may pass for the moment. On its own revealed facts, it is perfectly plain that the Wests, the assignors there, were treated as vicarious lessors because Humble, the assignee and considered there to be a lessee, alone bore all the costs of production as "the transferors * * * were chargeable with no part of the costs thereof." 150 F.2d at page 727.

The upshot of this is that this Court refuses to credit—and properly so—the

---

4. In 1949 Taxpayers received from Forest and Stanolind $525,000, note 1, column (b) and (d). After taking into account the $100,000 "excess" received by Faskens from Stanolind (column (d)) over and above the amount paid back to it (column (e)), the Commissioner reduced reported income of $1,001,156.25 by $425,000. As this wiped out all deductions for intangible drilling expense and depreciation on tangibles, the net effect of it was to increase income by $153,398.37.

The same thing was done in 1950. By disregarding the payment of $575,000 and the amounts paid back to the Oil Companies, the Commissioner's action resulted in wiping out the entire amount for intangible drilling expense and the amount of depreciable assets so that net income was increased by $228,473.15.

5. The stipulated facts indicate that Faskens' 55% share of production had a per barrel cost averaging approximately 17¢ per barrel for the Forest wells, 10¢ to 14¢ for Stanolind, and 8¢ per barrel for Anderson-Prichard.

determination of the Commissioner that the payments to and from Taxpayers and the Oil Companies should be mutually offsetting. The Court—and properly so —considers the contracts to be genuine in nature and in purpose with none of the characteristics which would enable us either expressly or impliedly to pierce through them as unreal or transparent devices. Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Commissioner of Internal Revenue v. Hawn, 5 Cir., 1956, 231 F.2d 340. At the same time the Commissioner, in decisive and tangible terms, treats the contracts as the sale of an undivided 45% interest in the oil and gas in place for which capital gains treatment is accorded and which gives rise to incidental treatments consistent only with such a sale and not a vicarious lease.

Of course, the ironic thing about it is that this Court affirms the action of the Taxpayers and the District Court in the propriety of taking the deductions for intangibles and for depreciation on tangibles. The Taxpayers are kept from the enjoyment of the fruits of that position which we hold is rightfully theirs because we theoretically permit the Commissioner to here take a position entirely inconsistent with that which he took when the deficiency was precipitated. It is a strange thing that in the lofty language sometimes employed about the routine suit for income tax refund, Carter v. Campbell, 5 Cir., 1959, 264 F. 2d 930; Lewis v. Reynolds, 10 Cir., 1931, 48 F.2d 515, affirmed 1932, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293, which speaks in terms of equities, the Taxpayer is denied the benefit of his correct legal contention because the Commissioner ought not to have taken the position he did in making his determination. And this was, after all, the sole event which precipitated the deficiency. The Government achieves this result with no appeal—and no right of appeal—from the Commissioner's action and long after the statute of limitations has run save again for equity's intervention by setoff. The equitable setoff is brought about wholly from the necessity of the Taxpayers seeking review of a disallowance of deductions which we now hold to have been unlawful.

*Fact Three:* This transaction, the Court says, is the equivalent of a lease with a 55 per cent royalty and the payment a bonus, advance royalties of $1,-100,000.

Analysis of these contracts will demonstrate, I think, that apart from the undertaking to pay back dollars in sums substantially. the same as received—a fact which the Court regards as in no way bearing upon the genuineness of these contracts as business arrangements —these conveyances were the sale of an undivided interest in minerals and not the mere creation of the limited estate of a lessee. Conceding that in tax matters, it is proper to treat these things for what they really are, rather than what the parties purport to call them, 10 Mertens, Law of Federal Income Taxation § 61.01–06, these conveyances have all the genuine earmarks of an outright sale of minerals and none of the attributes or limitations of a lease. This is reflected both in the nature of the estate conveyed and more important, in the nature of the liabilities and risks imposed.

In Texas an oil and gas lease creates a determinable or defeasible fee in the oil and gas in the land which is lost on cessation of use of the land for purposes of oil and gas expiration, development and production. 1A Summers, *Oil & Gas* § 165 (1954); 31A Tex.Jur., *Oil & Gas* §§ 117–119, 156, 158–164 (1947). Being feasible, when an oil and gas lease terminates, the rights of the lessee come to an end. Id., § 164. In contrast to this limited estate, a mineral "deed passes title to the minerals in absolute fee simple, and cannot be regarded as passing only a determinable fee." Id., § 51 at 93. "A mineral deed invests the grantee with the title to the oil and gas in place." If less than the whole is conveyed "the grantor and grantee become tenants in common of the oil and gas in

place." Id., at 94. "The Texas courts hold that because a cotenant has the right to occupy the whole joint property * * * a cotenant may himself, or by lease to another, utilize oil discovered upon land, without the consent or concurrence of other cotenants. If a lease be executed by a cotenant, the nonconsenting cotenants may recognize the lease and receive their fractional interest in the royalty, or they may reject the lease, and receive their fractional part of the oil produced, less their proportionate part of the cost of discovery and production." Davis v. Atlantic Oil Producing Co., 5 Cir., 1936, 87 F.2d 75, 77, 31A Tex.Jur. § 81.

Ordinarily the lessee under an oil and gas lease has the obligation to explore for, develop and produce. Id., §§ 131–136. On the other hand the lessor, normally in the position of the one owning the minerals at the time of the lease, reserves a royalty free of cost. An owner of minerals, on the other hand, undertaking to develop on his own or in conjunction with a cotenant and without the intervention of an oil and gas lease jointly made to a third person inescapably has to bear the cost of development. Those costs would include the cost of the well, drilling the well, equipping the well, bringing in production, and the maintenance and operation of the wells, the leases, the gathering lines, and the like.

All of the costs incurred by Taxpayers here are found by the Court to be reasonable and properly included. The parties stipulated with respect to the $25,000 per well payment that at the time the contracts were executed a reasonable estimate of 55% of the total costs was $25,000 and by stipulated actual figures, the total average cost per well for Forest, Anderson-Prichard, and Stanolind ran from $46,824.98, $48,751.-81, $49,250.10 of which 55% would be for Faskens' account.

A lessee would not incur such drilling expenses. Nor would he incur the cost of operations after production. And the lessor (West) in West v. Commissioner,

supra, incurred no charges. Here, the Faskens, likened by the Court to the Wests, have paid out over $1,000,000 in development plus many thousands more in operations.

In addition to the actual payments, the joint ownership of the minerals as cotenants under the contracts involved here subject the Faskens to unlimited liabilities as to which the parties have fixed no ceiling and for which the Faskens are liable for 55%. These include, among other things, the cost of replacing worn out or collapsed casing in the wells, the cost of salt water disposal, the cost of reworking or deepening any original well which might require treatment, the cost of drilling wells on a denser drilling pattern, the cost of water flooding, or other secondary recovery operations, costs in the event any well drilled should be a gas well rather than an oil well, and the cost of drilling wells to producing formations within the specified depth other than the specified horizon. In addition to these contingent liabilities for expenditures in the joint operation as cotenant of the properties, the Faskens had a public liability as a coprincipal for operations jointly carried on.

None of these expenditures or contingent liabilities would be imposed upon a lessor under an oil and gas lease. None of these expenditures or liabilities was imposed on the Wests as the vicarious lessor in West v. Commissioner.

If this Court were to hold, as did the Commissioner, that the cross-payments could be disregarded, there might be some basis for declining to extend to the Taxpayers the tax benefit of a deduction for intangibles paid out of those proceeds. But so long as the Court adheres to the view that the payments to and from are genuine, then the position of the Faskens is patently not that of a lessor under an oil and gas lease. True, they get approximately $1,100,000 as a cash payment, but this is not for the conveyance of a lease. It is for the sale of an absolute, indefeasible fee interest in 45% of the minerals in place. The Faskens owned 100% of the minerals.

They now own 55%. They retain no interest whatsoever in the 45% conveyed. Nothing they get out of the production of the wells is attributable to the 45% conveyed. All they get comes from the 55% reserved. And for that portion, they have—as the Court has now held—paid their proper or agreed proportionate basis of the cost of the wells and the subsequent operation of them.

Since the Taxpayers do not have the vicarious status of a lessor, the rule of Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, does not apply. Dragging in the economic interest concept to defeat a claim for deduction for intangibles and depreciation on tangibles—which the Court holds Taxpayers entitled to—ignores the whole nature of that concept, the Texas law of oil and gas, the contracts of these parties, and the actual performance thereunder which we hold to be genuine and for a good business purpose. If the economic interest concept has anything to do with this case at all, then Helvering v. Elbe Oil Land Development Co., 1938, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, should be controlling. The transfer of the leases was held to be an absolute sale. The cash consideration received was declared to be capital gains, not depletable income, because *nothing* was reserved in the thing sold to which the assignor could look for the recovery of his capital investment. Here the 45% was sold absolutely and finally. As owners of the working interest the Faskens were more nearly in the position of a mineral lessee, not lessor, who sells a part (45%) of his lease to another for a cash consideration. In such case the cash payment is treated as capital gains, and not ordinary income subject to depletion. Hammonds v. Commissioner, 10 Cir., 1939, 106 F.2d 420, 425, citing Commissioner of Internal Revenue v. Fleming, 5 Cir., 1936, 82 F.2d 324.

To look through form to substance is one thing. To look through form *and* substance to find something which is not there, which none of the parties thought was there, which no law considers to have been there, and which no one, until this Court so determined, declared to be there, is quite a different thing. We cannot, as Judge, later Justice, Holmes wrote, merely by saying so, make Bunker Hill Monument into the Old South Church. Goode v. Riley, 1891, 153 Mass. 585, 28 N.E. 228. And "the thing said to be passed off must resemble the thing for which it is passed off. A frying pan cannot be passed off as a kettle." Becker v. Loew's, Inc., 7 Cir., 1943, 133 F.2d 889, 893.

That, too, is a stubborn fact which leads me with like tenacity, but deference, to dissent.